Good morning, Your Honor. May it please the Court, my name is Liya Jamilova. I represent the petitioners in this case. This case is we believe that the petitioner suffered past harm on account of his membership in a particular social group of Russian speakers in Moldova and also on behalf of his political opinion in support of the Communist Party in Moldova in 2009. We believe that because he did suffer past persecution, there is a rebuttable presumption of future harm and he should be granted asylum. Even if this Court does not find that the past harm rises to the level of persecution, we believe that his membership in disfavored group of Russian speakers in Moldova that suffers pattern and practice persecution and that he can show individualized risks to himself amounts to the level of well-founded fear of future persecution. Regarding the past persecution and the harm that he suffered, he suffered fractured spine at the events of 2009 He was harmed by third parties. However, it was in front of the police officer who knew that he was being harmed and who refused to help him and turned away from the petitioner. We do believe that because the harm is severe, it's fractured spine, it's lifelong consequences. This does amount to the level of persecution especially because police officer did know about that and did not do anything to help and turned away. The immigration judge when deciding on this issue, and we can look into the IJ's decision because board incorporated his decision, stated that petitioner suffered a brief incident that caused lower back pain. That's clearly undermining the injury that the petitioner suffered. Also, we believe that the immigration judge and the BIA made a mistake of taking harm suffered on account of him being a member of Russian speakers apart from the harm suffered because of his political opinion. Because the only reason why he was supporting the Communist Party on Moldova was because they were in support of Russian speakers in Moldova. So all the harm that he suffered arose from him being a member of a group of Russian speakers in Moldova and should have been taken in some instead of separating it. Let me ask you about the IJ's determination about this skirmish that took place with, at least it was characterized as a political opponent, but then the IJ went on to say that perhaps the police didn't do anything vis-a-vis him particularly, but what they were doing is basically trying to keep the groups apart. How can we second-guess that determination? It's actually very easy. So if you look at the record, the petitioner testified that police said we have an order not to interfere. The friend in his letter who went to the police for help also said police had order not to interfere and turned away from him. And then all of a sudden in IJ's decision we have the language that police had more urgent task of keeping groups apart so less harm would happen and to maintain the line. Nowhere in the evidence in the record there is a statement that police had orders to maintain the line or to make sure that less harm occurred. All was in the record. Police said we cannot interfere and turned away. Also, the record does not support this decision of the immigration judge because later on you can see that actually DHS filed that evidence stating that police engaged in throwing water and tear gas at the protesters. So they did not have an order not to interfere. In fact, they did interfere. Whatever the severity of what happened to your client, it's one instance, right? Of the physical harm, correct. Yes. Yes. And even if, taking your side of the facts, even if the police decided that they were not going to stick their nose in between these two factions who wanted to harm each other, how does that amount to persecution? And this is going back to my argument that the whole harm should have been taken together because that was the physical harm. The whole harm from this one single incident? No, all the harm that he stated that he suffered in the past because he's a Russian speaker or because he supported this because he suffered one incident of physical harm. Then he went to the doctor. Years later, doctor refused to help him because he spoke Russian. And also IJ states, we don't know what language the doctor spoke. We know from the record, actually petitioner did testify that conversation happened in Russian. But then the doctor said, I'm not helping you unless you switch to Romanian right now. So all of those instances of harassment at the market saying Russian occupants go home, all of that should have been taken together. Is the doctor a state doctor? It was a public clinic and petitioner that did testify to that. Also evidence that were provided to the judge state that petitioner is not the only person who was refused medical help because he did not speak Russian. We also have evidence of other Russians being refused medical help, for example, at the intensive care. And all the evidence were disregarded by the immigration judge. Also regarding treatment. Can you back up just a little bit? Who did not speak Russian? Everybody spoke Russian, but the doctor refused to continue in Russian unless petitioner switched to Romanian. Okay, go ahead. Yes. Also, there is a lot of evidence in the record, not only about society treating Russians as a misfavor group, but also government treating Russians as a disfavor group. For example, in 2009, June 28 was announced as a day of freedom from the Soviet-Russian occupation and commemoration of the victims of the communist totalitarian regime. And the government prohibited collection of signatures for the election in Russian language. The parliament committee found that Russian speakers are being denied access to justice because they do not speak Romanian. Also, the same commission found that health care is affected as well. The European Commission Against Racism made a finding that members of the language minorities in Romanian suffer obstacles in access to health care. So we don't just have social harassment and discrimination that the judge called it. We have a lot of instances of the government also treating this group as a disfavored group. Also, ironically, the immigration judge himself made a number of findings that go toward Russians being a disfavored group. However, after that, he turned around and made a finding to the contrary. He stated there is some sort of pattern and practice of persecution against persons who are identified as having Russian nationality. Then he stated it does appear that speaking Russian in public business or institutions and so forth is disfavored. Also, he stated the background evidence does indicate that there is a tension between those who have a more pro-Russian outlook and those who have a more pro-Western outlook. And finally, his statement, in addition, there can be some tension between persons who speak Russian and persons who do not speak Russian. And despite all of this finding, he turns around and finds no disfavored group, no pattern and practice. And he does not give any explanation why, after everything, there is no disfavored group and no pattern and practice. The same did the BIA. They just affirmed the immigration judge's decision about that. BIA stated that petitioner, us, in the brief to the BIA, stated that we do not believe that if disfavored group exists, we have to show any individualized harm. We do not know where that language came from. We never made such statements to the BIA. In fact, we did state that, yes, he did suffer harm and that harm should go toward the evaluation of the individualized risk of future persecution. And we stated physical injury that should have been taken as part of the past harm, that he was being harassed at the supermarket for speaking Russian. He was refused the help by the doctor. And when he called the state airline, they refused to talk to him in Russian until his wife stated they were in the United States. Once they understood that the people were speaking Russian from the United States, they had no problem talking to them in Russian. That clearly says that treatment of Russian speakers in Moldova is different from treatment of the rest of the population and that they are disfavored group. The immigration judge mainly focused on him losing job and disregarded all other evidence and all other testimony. We do understand that it was a private company. However, he was discriminated because he didn't speak Russian. But from our perspective, that's not the main event in the case. And the immigration judge and the BIA completely centralized their position on him losing job. Also, this case is similar to Mgoyan v. INS that Ninth Circuit decided in 99. In part, that after the collapse of USSR, a lot of issues that were suppressed before it came to the surface. In Mgoyan, it was Armenian case where Armenian society started blaming the family for genocide that happened in Turkey, even though this family had nothing to do. They were just Kurdish Muslim, and that's why they were blamed. In our case, our petitioner is being blamed for the Soviet occupation, for the Russian activity in Moldova and outside of Moldova. Even though he has nothing to do with that, he's not even ethnically Russian. He is Ukrainian. However, his main language of communication is Russian. Also, we do believe that the judge in this case should have, and BIA later on, should have taken everything that happened in perspective of history and geopolitical situation, which he did not. And it was all in the record. For example, Soviet Union occupied Moldova from 1940 up until 1991. And then since 90s, Transnistria, which is part of Moldova, has been occupied by Russian army because they gave citizenship to the citizens of Transnistria, so they have a pretense for the army presence in there. So you have an independent country with Russian forces present there. And next door, they have Ukraine, where Crimean annexation happened when armed conflict is happening between pro-Russian forces. And Ukrainian forces, and all of this happening around the petitioner and around what's happening. So, of course, the society in Moldova is not blind. They see what Russia is doing. They respond to that. And since 2010, it has been worsening because the Communist Party lost power in 2009. I didn't say it in the beginning. I apologize, but I would like to reserve the remainder of the time for the counterargument. You may. Good morning. May it please the court. Excuse me. My name is Tony Pottinger, and I represent the government in this case. To briefly circle back to one of the questions from the bench or comments about second guessing, respondent would just respectfully reiterate our point in our brief that we're operating under the substantial evidence standard. It's a very deferential standard with respect to findings of fact. Secondly, with respect to the disfavored group analysis, it's not enough alone to be a member of disfavored group. You have to have some indicia that you'll be individually targeted. In this case, petitioner did not carry that burden of proof. And this court can look to its precedents, both published and unpublished. I point to the Garilova case, unsighted case that we cited in our brief that looked at the pattern in practice against people in former Soviet republics. That said, subject to your questions, Your Honor, we would submit on the brief and yield the remainder of our time. You have one question, and it's a hypothetical question. If a pro-democracy demonstrator in Hong Kong, with knowledge that he was about to be arrested and potentially tried in mainland China for exercising what appear to be democratic rights, would that person have a colorable basis for seeking asylum? It would be fact specific as far as if I could just respond to your question. To bring it closer to this case, this individual actively participated in demonstrations, including when there was violence between police officers and demonstrators, use of force on both sides. The local police allowing pro-democracy demonstrators to be harmed, third persons harmed, etc. In other words, a situation not unlike what the petitioner faced in this case. Would that be a colorable basis? It could, Your Honor. It would, again, be fact specific. They would have to be specific to that demonstrator. You know, I'm hesitant in generic terms to say that, you know, participating in a pro-democracy protest by itself would entitle one to asylum. But certainly it would be a factor and it would, the finder of fact, the immigration court in this hypothetical case would have to look at specifics, take testimony. But there have been cases where there have been people granted asylum on the basis of political activity to include participating in protests. But it's a case by case basis. Thank you. Thank you. I would like to address the standard that was mentioned by the agency attorney. So even though we're disputing which standard should be applied here, de novo or substantial evidence, we do believe that it doesn't really matter for our case. We do believe that even under the standard that is suggested by the government, we still win because the judge made such findings that completely contradict the evidence in front of him with no logic and no support to his findings. So we do believe that any reasonable fact finder in this set of facts should have found differently from the immigration judge. And government stated Gavrilova case, which I believe is completely not applicable to this case because the facts are completely different. That case is Russian speakers in Ukraine. Our case is Russian speakers in Moldova. Ukraine actually historically was the source of Russian identity. It was Kiev's Russia in the past. So they're never been apart from Russia historically. Then now they're separate individual countries. However, Moldova was part of Romania and from 1918 to 1940, it was a part of Romania. And then Russia liberated or occupied, depending on how you look at it, that territory. And so in 91, they became independent. Second, the languages are completely different. Ukrainian and Russian, both Slavic. Romanian is Roman language, so it's completely different. And also in that case, the petitioner did not suffer any personal harm, never claimed any personal harm, and just claimed here because of the treatment of Russian speakers in Ukraine. And finally, the conflict in Ukraine is very recent. So the treatment of Russian speakers there will be different because it's based on the military conflict with Russia and annexation in Ukraine. Before then, they did not have tensions and Romania had tensions ever since before Russian empire. Thank you. Thank you both for the argument this morning and also for the briefing. The case of Korsak versus Barr is submitted. We have Torres v. Saul and Nikolochuk v. National Casualty are submitted on the briefs and we're adjourned for the morning.
judges: Hawkins, McKeown, Harpool